FILED

2016 Sep-06  PM 01:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **BOBBY ASHFORD,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.: 2:15-cv-00291-RDP** |
| } | |
| **DANBERRY AT INVERNESS; et al.,** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OPINION

### I.      Introduction

This case is before the court on Defendant's Motion for Summary Judgment (Doc. #44), filed February 29, 2016. The motion is fully briefed. (Docs. # 45, 51, 56). Plaintiff claims he was the victim of a sexually hostile work environment and was discharged because of his sex.[1] Defendant contends Plaintiff's claims fail because he: (1) failed to report allegations of a hostile environment or sexual harassment during his employment; (2) violated the attendance and reporting policy by failing to report for scheduled work; and (3) has presented insufficient evidence to survive summary judgment. After careful review, the court agrees and concludes that Defendant's Motion is due to be granted in part and denied in part.

### II.      Relevant Undisputed Facts[2]

Plaintiff, who is an openly gay man[3], was employed by Defendant Q Team Resources,

---

[1] Although he included a race discrimination claim in his Amended Complaint (Doc. # 18), Plaintiff has abandoned that claim by not addressing it in his opposition to summary judgment. (Doc. # 51; *see* Doc. # 56).

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

LLC ("Q Team") as a Server in the Dining Department at Danberry at Inverness ("Danberry") from September 24, 2012, until his discharge on February 12 or 13, 2014.[4] (Doc. # 51-1 at Ex. 1, ¶¶ 1-2; Doc. # 46-1 at ¶ 3). Plaintiff also worked as a Resident Assistant and Resident Sitter in Danberry's Healthcare Department from July 2013, until February 12 or 13, 2014. (*Id.*). Danberry, a retirement community located in Hoover, Alabama, provides living accommodations, as well as fine dining and other activities, for elderly men and women. (Doc. # 46-12 at ¶ 3). As a Server at Danberry, Plaintiff reported to Dining Room Manager Daniel Vest and Director of Dining Services Dave Wallingford. (Doc. # 51-1 at Ex. 1, ¶ 3; Doc. # 46-1 at ¶ 4).

At the beginning of his employment, Plaintiff was informed of the attendance and punctuality requirements stated in both Danberry's Employee Handbook ("Handbook") and Attendance Policy ("Attendance Policy").  (Doc. # 46-1 at ¶ 8; Doc. # 46-3; Doc. # 46-5). The Attendance Policy mandates a No Call/No Show attendance policy, stating that employees who fail to report to work or call in for two consecutive workdays or on two separate occasions will be considered to have voluntarily resigned or abandoned their jobs (unless that employee is medically incapacitated). (Doc. # 46-1 at ¶ 7; Doc. # 46-4). The Attendance Policy further states that an employee may be subject to discipline, up to and including termination, for neglecting to report for work without calling in, even on a single day. (*Id.*). Specifically, the Handbook states that "An absence of two (2) days without notice by the employee is considered Job Abandonment.  You will be subject to disciplinary action up to and including termination." (Doc. # 46-1 at ¶ 6; Doc. # 46-3 at p. 12). Throughout most of his employment at Danberry,

---

[3] Plaintiff has alleged that he "is a homosexual," and that "[d]uring [his] employment a male supervisor made comments about his sexual orientation and sexual preference." (Doc. # 18 at ¶ 10).

[4] The parties' evidentiary submissions do not clearly specify which date Plaintiff actually was discharged.

Plaintiff communicated with Vest or Wallingford regarding absences from work and tardiness. (Doc. # 46-1 at ¶ 15; *see also* Doc. # 51-1 at Ex. 1, ¶ 3).

Plaintiff was also informed of Danberry's anti-discrimination policies, as well as the internal complaint procedures that should be followed if he or another employee was subjected to sexual harassment or discrimination in the workplace. (Doc. # 46-1 at ¶ 20).  Plaintiff twice signed an acknowledgement of his receipt of the CRSA/LCS Employment Services, LLC Harassment Policy ("Harassment Policy").  (*Id.* at ¶ 21; Doc. # 46-10; Doc. # 46-11).  The Harassment Policy provides that the "company has zero tolerance" for both harassment and sexual harassment, "and will investigate any complaint of" either.  (Doc. # 46-10 at p. 2).  The Harassment Policy also sets forth that:

> Any employee, who becomes aware of an incident or harassment, whether by experiencing it, witnessing the incident or being told of it, must report it. . . . You are required to notify your supervisor or the Human Resources Director, President or a member of Managing Committee immediately of any harassment, even if you are not sure the offending behavior is considered harassment under this policy. Any possible incidents of harassment must be immediately reported to a manager or other management representative by anyone who may witness them.

(*Id.* at p. 3).

In December 2013, Plaintiff was involved in a playful altercation with another Danberry employee. (Doc. # 51-1 at Ex. 1, ¶ 5; *see also* Doc. # 46-1 at ¶ 22).  Plaintiff states a white male co-employee struck him, and Plaintiff responded by striking him back. (Doc. # 51-1 at Ex. 1, ¶ 5). The two then engaged in horseplay. (*Id.*). Vest was present and witnessed the horseplay. (*Id.*).  On January 13, 2014, Plaintiff attended a meeting with Karen Hebert, Danberry's Human Resources Director, who informed him that the individual with whom he engaged in horseplay had filed a complaint of sexual harassment against him. (Doc. # 51-1 at Ex. 1, ¶ 6; Doc. # 46-1 at ¶¶ 2, 23). During this meeting, Plaintiff again signed and acknowledged the Harassment Policy.

(Doc. # 46-1 at ¶ 23; Doc. # 46-11; Doc. # 51-1 at Ex. 1, ¶ 6).  He also denied having engaged in any sexual harassment, and stated he wanted to meet with Vest, the complainant, and Danberry's Executive Director, Jaclyn Gardner. (Doc. # 51-1 at Ex. 1, ¶ 6).  He claims that Hebert assured him such a meeting would be scheduled, but Plaintiff never heard back from her about a meeting.

Effective August 6, 2013, Danberry initiated a Slip Resistant Footwear Program/Policy (the "Footwear Policy"). Doc. # 46-1 at ¶ 9; Doc. # 46-6). The new Footwear Policy required employees, for safety reasons, to wear slip-resistant shoes while working in the Dining Room. (*Id.*). The policy required compliance by all employees on or before September 30, 2013. (*Id.*). Plaintiff acknowledged his receipt of the Footwear Policy on September 13, 2013. (Doc. # 46-6).

In the past, and throughout his employment at Danberry, Plaintiff had worn Crocs, which he viewed as slip-resistant shoes. (Doc. # 46-1 at ¶¶ 10, 12; Doc. # 51-1 at Ex. 1, ¶ 11). However, in late January 2014, Vest informed Plaintiff that Crocs were inappropriate for work because they had air holes on their sides. (Doc. # 51-1 at Ex. 1, ¶ 12).

On February 5, 2014, Plaintiff attended a server-wide Dining Services meeting, led by Wallingford and Vest. (Doc. # 46-1 at ¶ 11; Doc. # 51-1 at Ex. 1, ¶ 13). At that meeting, among other things, Wallingford reiterated the importance of the slip-resistant shoes policy. (*Id.*). Wallingford stated, "If you don't have the proper shoes by tomorrow, don't bother coming into work." (Doc. # 51-1 at Ex. 1, ¶ 14). Following this meeting, Plaintiff went to work his shift on Danberry's Healthcare side without speaking to either Wallingford or Vest. (*Id.*).

Because he did not have proper shoes to wear, Plaintiff did not report to work as a Server as scheduled at 10:30 a.m. on February 6, 2014. (Doc. # 51-1 at Ex. 1, ¶ 15; Doc. # 46-1 at ¶ 12). The work schedule for the week of February 2-8, 2014, specifically instructed Servers: "If you are running late then you must call and speak with [Wallingford] or [Vest]. . . . You have no

4

excuse not to call when you are going to be late." (Doc. # 46-7) (setting forth Vest's phone number). Plaintiff unsuccessfully attempted to call Vest's office early in the morning of February 6, 2014, to inform Vest that he did not have the appropriate footwear. (Doc. # 51-1 at Ex. 1, ¶ 15; *see also* Doc. # 46-1 at ¶ 15) ("[Plaintiff] did not text or call either [Vest or Wallingford] on February 6, 2014 that he would be absent."). Plaintiff then emailed Vest at 8:54 a.m. (a little more than ninety minutes before his 10:30 a.m. shift was scheduled to begin), saying that he had ordered non-slip shoes for work and that they would arrive in three days. (Doc. # 46-8). Plaintiff did not explicitly state in the email that he would not be at work that day. (*See id.*). Defendant alleges that, when a Server is not at work, the quality of service Danberry's staff can provide to its residents for both lunch and dinner is greatly affected. (Doc. # 46-12 at ¶ 3). Because Plaintiff was absent, the Dining Service was short staffed, and Danberry's service was hindered. (Doc. # 46-1 at ¶ 14).

On February 7, 2014, Plaintiff reported to work as a Resident Assistant in Danberry's Healthcare Department, where he worked a full shift from 6:48 a.m. until 3:00 p.m. (Doc. # 51-1 at Ex. 1, ¶ 17; Doc. # 46-1 at ¶ 16). Plaintiff passed by Wallingford's and Vest's office in order to get to the Healthcare Department. (Doc. # 46-1 at ¶ 16). Plaintiff alleges he spoke to Wallingford as he passed the Healthcare side, but that Wallingford did not respond. (Doc. # 51-1 at Ex. 1, ¶ 17). Defendant contends Plaintiff did not speak to Wallingford. (Doc. # 46-1 at ¶ 16).

While working his shift as Resident Assistant on February 7, Plaintiff noticed that his name had been crossed off on the Server schedule for the following day (February 8, 2014). (Doc. # 51-1 at Ex. 1, ¶ 18). Plaintiff's shoes had come in on February 7, so he had planned to work on February 8. (*Id.* at ¶ 19). After his shift on the Healthcare side ended, Plaintiff says he approached Vest to ask about the work schedule for the remainder of the week. (*Id.* at ¶¶ 18, 20)

Plaintiff states that Vest told him that he was not sure why Plaintiff had been marked off the schedule.[5] (*Id.* at ¶ 20). Vest was the person responsible for scheduling all shifts. (*Id.*). Plaintiff says he took this to mean that he was not to report to work on February 8, because in the past when an employee's day was marked off the schedule, that employee was not expected to report to work. (*Id.*).

Plaintiff did not show up for his shift on February 8, 2014. (Doc. # 46-1 at ¶ 17; Doc. # 46-12 at ¶ 5).  He did not call or text Vest or Wallingford to report that he would not be at work. (*Id.*).

On February 10, 2014, Wallingford and Karen Hebert both called Plaintiff to discuss his attendance, and left a voicemail stating that they needed to speak with him in the office. (Doc. # 46-1 at ¶ 18). The next day (February 11, 2014), Plaintiff arrived at Danberry and met with Office Manager LaShaun Hicks and Wallingford. (Doc. # 46-1 at ¶ 18; Doc. # 51-1 at Ex. 1, ¶ 22). Plaintiff states that Hicks acted as if she was unaware of the meeting and called Hebert, but that Hebert asked Hicks to attend instead. (Doc. # 51-1 at Ex. 1, ¶ 22). Defendant contends Plaintiff's arrival was unannounced; Plaintiff disagrees. He contends that he received a call from Hebert on February 11, 2014, informing him that Wallingford had been looking for him. (Doc. # 51-1 at Ex. 1, ¶ 21). Plaintiff further asserts he spoke with Hebert and had just seen Wallingford on February 7, the date he noticed that he had been taken off the schedule to work on February 8. (*Id.*). Plaintiff also claims that he requested a meeting with Wallingford and Hebert to discuss his attendance issues from the preceding days. (*Id.*).

---

[5] Defendant contends that Plaintiff did not speak with Vest, (Doc. # 46-1 at ¶ 16), but the court views this evidence in the light most favorable to Plaintiff for purposes of this motion.

The events that transpired on February 11 are also disputed.[6] According to Defendant, Wallingford told Plaintiff it was unacceptable that he had missed his Dining shifts on February 6 and 8 without previously speaking with one of his managers. (Doc. # 46-1 at ¶ 18). However, Plaintiff claims that Wallingford told him he had been marked off the schedule for February 8 because neither Wallingford nor Vest had heard from Plaintiff on February 6. (Doc. # 51-1 at Ex. 1, ¶ 23). Plaintiff contends he corrected Wallingford by reminding him that he had sent an email to Vest stating that he was awaiting the arrival of his new slip-resistant shoes. (*Id.* at ¶ 24). Plaintiff then asked to be put back on the schedule. (*Id.*). According to Plaintiff, Wallingford told Plaintiff that he would speak with Hebert, Executive Director Gardner, and Director of Healthcare Jeana Robinson, and get back to Plaintiff. (*Id.*). However, Defendant asserts that Wallingford terminated Plaintiff's status as a Server during this meeting due to his attendance issues. (Doc. # 46-1 at ¶ 18). And while Plaintiff says his status as a Resident Assistant in the Healthcare Department was not addressed during this meeting, (Doc. # 51-1 at Ex. 1, ¶ 24), to the contrary, Defendant states that Plaintiff was told that more discussions would be held with Hebert, Gardner, and Robinson concerning his continued employment with Danberry in the Healthcare Department. (Doc. # 46-1 at ¶ 18).

What is undisputed is that Executive Director Gardner discharged Plaintiff, purportedly for missing his Server shifts in the Dining Department on February 6 and 8, 2014. (Doc. # 46-12 at ¶ 7). Gardner reviewed Plaintiff's attendance and prior discipline history before making her decision. (*Id.*; *see also* Doc. # 46-1 at ¶ 19; Doc. # 46-9). With the exception of the December 2013 horseplay incident, Plaintiff was not the subject of any complaints of harassment from his co-workers while at Danberry. (*See* Doc. # 46-1 at ¶ 19; Doc. # 46-9). Nor was he the subject of

---

[6] The court acknowledges that the evidentiary submissions concerning the February 11, 2014 meeting contain Plaintiff's affidavit and Hebert's affidavit. There are no affidavits or testimony from Wallingford or Hicks.

any complaints from residents at Danberry. (Doc. # 51-1 at Ex. 1, ¶ 4). But Plaintiff had been written up and disciplined six times for tardiness (on October 28, 2012, November 26, 2012, February 18, 2013, March 28, 2013, July 24, 2013, and February 3, 2014), and one time for failing to complete his shift (on June 12, 2013). (Doc. # 46-1 at ¶ 19; Doc. # 46-9). In addition to that discipline history, Gardner considered input from Hebert, Wallingford, Vest, and Robinson. (Doc. # 46-12 at ¶ 8). Gardner's decision to terminate "was based strictly on [Plaintiff's] attendance issues in the Dining Room." (*Id.*). Hebert told Plaintiff that his employment had been terminated for two no-calls and two no-shows. (Doc. # 51-1 at Ex. 1, ¶ 25).

Plaintiff contends his termination is a result of discrimination based on his sexual gender identity and sexual preferences. (Doc. # 18). He contends that he was subjected to a hostile work environment because of his sexual orientation. (*Id.*). Plaintiff avers that throughout his tenure at Danberry, Vest made several unwanted comments about Plaintiff's sexual orientation and sexual preferences, including, "are you a cross-dresser," "do you dress in drag," "are you a drag queen," and referred to the bag in which he stored his belongings as a "purse." (Doc. # 51-1 at Ex. 1, ¶ 7). Plaintiff claims that Vest would make these types of comments in front of Plaintiff's co-workers, and that the comments were motivated by Vest's belief that Plaintiff did not conform to the stereotype associated with the male gender. (*Id.* at ¶¶ 7-8.).

LaShunda Moore, a food runner for the Dining area at Danberry from December 2012 to July 2014, states that she had heard Vest "pick on [Plaintiff] every day." (Doc. # 51-1 at Ex. 2, ¶¶ 2, 5). Moore witnessed Vest call Plaintiff a "Drag," and tell Plaintiff that "your butt is too big for those pants." (*Id.* at ¶ 4). She also confirms that "Vest would call [Plaintiff's] bag a purse." (*Id.* at ¶ 3). Further, Moore claims that Vest allowed other dining room attendants to arrive to work late without reprimanding them, but would openly reprimand Plaintiff. (*Id.* at ¶ 6).

Karonda Nelson, a Danberry dining room attendant, overheard Vest remark to Plaintiff that the bracelet Plaintiff was wearing was a "girl's bracelet" for "females and not for guys to wear." (Doc. # 51-1 at Ex. 3, ¶ 4). Nelson also states she witnessed Vest call Plaintiff a cross dresser and ask Plaintiff "why are you carrying that purse" when referring to his lunch bag. (*Id.* at ¶ 3). Additionally, she states that on Halloween 2013, when Danberry's employees were permitted to wear costumes to entertain the residents, Vest told Plaintiff he looked like a "drag queen." (*Id.* at ¶ 5).

When confronted with impermissible harassment, an employee is required to follow Danberry's internal complaint policies and procedures. Defendant contends that Plaintiff never made any sort of internal complaint. (Doc. # 46-1 at ¶ 24). The parties disagree about the state of the Rule 56 record on this issue and whether Plaintiff has pointed to sufficient evidence in the summary judgment record to avoid judgment as a matter of law. Plaintiff states that he informed Cynthia Crosby, who he (mistakenly) believed to hold the title of Head Nurse in the Healthcare Department, of Vest's harassment due to his gender identity and sexual preferences. (Doc. # 51-1 at Ex. 1, ¶ 9). He has not specified when he talked to Crosby. He has stated that because Vest's behavior continued, he assumed Crosby did not report it to any of her superiors. (*Id.*). In its motion to strike, Defendant points out that Crosby is not, and never has been, "Head Nurse," nor was she a member of the Managing Committee.[7] (Doc. # 57-2 at ¶ 3; *see also* Doc. # 56 at p. 2). At various times during her employment (which lasted from September 2012 through July 15, 2014), she held the positions of Certified Nursing Assistant, Licensed Practical Nurse, and Registered Nurse. (Doc. # 57-2 at ¶ 3, pp. 4-7).

---

[7] The Second Declaration of Karen Hebert (Doc. # 57-2), included as an exhibit to Defendant's motion to strike, is a part of the record of this case. Therefore, the court may consider it for purposes of summary judgment.

Plaintiff also claims he informed Chuck Lanzi, who he (mistakenly) understood was the Head of Housekeeping/Maintenance, of Vest's prolonged harassment, but again assumed that Lanzi never reported the harassment because it did not cease. (Doc. # 51-1 at Ex. 1, ¶ 10). Lanzi has never been Head of Housekeeping/Maintenance, nor has he been a member of the Managing Committee. (Doc. # 57-2 at ¶ 4; Doc. 56 at p. 2). Instead, between September 2012 and February 2014, Lanzi was employed as a Driver and a Porter. (Doc. # 57-2 at ¶ 4, pp. 8-12).

## III.   Defendant's Motion To Strike

As an initial matter, the court addresses Defendant's motion to strike portions of Plaintiff's Declaration.[8] (Doc. # 57). In that motion, Defendant argues that all references in Plaintiff's affidavit to Cynthia Crosby and Cuck Lanzi should be stricken because Plaintiff did not identify those individuals in his Federal Rule of Civil Procedure 26 disclosures. The Federal Rules of Civil Procedure provide that a "failure to identify a *witness* as required by [Rule] 26(a) and (e) bars a party from offering that witness 'to supply evidence *on a motion*, at a hearing, or at trial, *unless the failure was substantially justified or is harmless.*'" *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1357 (S.D. Ga. 2015) (quoting Fed. R. Civ. P. 37(c)(1)) (some emphasis added, some emphasis in original). Here, Plaintiff refers to statements he made to Crosby and Lanzi in his own affidavit. (*See* Doc. # 51-1 at Ex. 1, ¶¶ 9, 10). He has not submitted affidavits from either individual. To be sure, there is an excellent argument that Plaintiff would be barred from doing so, and would be unable to rely on their testimony at trial. *See* Fed. R. Civ. P. 37(c)(1). But Plaintiff is not precluded from referring to his own statements to individuals not on the Rule 26 disclosures. Accordingly, Defendant's motion to strike (Doc. # 57) is due to be denied. Nonetheless, even considering that evidence along with the entire Rule 56 file, for the

---

[8] Plaintiff had an opportunity but did not file a response.

following reasons, Defendant's summary judgment motion is due to be granted in part and denied in part.

## IV.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson v. Liberty Lobby, Inc.*, teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## V.      Analysis

Plaintiff claims that Defendant violated Title VII's protections against sex discrimination by allowing a hostile work environment based on his sexual orientation and gender identity and terminating him due to his sexual orientation and gender identity.[9] Defendant contends Plaintiff's hostile work environment claim fails for two reasons. First, Defendant argues that Vest's comments regarding Plaintiff's sexual orientation were not severe enough to create a hostile work environment as required by Title VII. Second, Defendant asserts that Plaintiff neglected to follow proper procedure as outlined within the Harassment Policy when bringing his complaint about the alleged sexual harassment (and thus any alleged harassment is not attributable to Defendant). Defendant also insists that Plaintiff's termination claim fails as a matter of law because he has provided no evidence that Danberry used his violations of the Attendance Policy as a pretext for unlawful discrimination. The court addresses Plaintiff's claims, and Defendant's summary judgment arguments against them, in turn.

### A.      Plaintiff's Title VII Hostile Work Environment Claim.

By its plain language, Title VII protects individuals against employment discrimination on the basis of race, color, national origin, sex, and religion. 42 U.S.C. § 2000e-2. In a Title VII case, the burden is on a plaintiff to show by a preponderance of the evidence a prima facie case of illegal discrimination. *Lewis v. Smith*, 731 F.2d 1535, 1537 (11th Cir. 1984). In order for

---

[9] The parties do not dispute whether Plaintiff belongs to a protected group based on his claim of sex discrimination. It is well-settled that Title VII's protections against sex discrimination extend to a bar against discrimination based on gender stereotyping. *See Price Waterhouse v. Hopkins*, 490 U.S. 229, 250-51, 258-61, 272-73 (1989) (respectively, plurality opinion, White, J., concurring, O'Connor, J., concurring) (holding that Title VII bars gender stereotyping), *superseded on other grounds by statute*. And, in the context of a Fourteenth Amendment Equal protection challenge (filed pursuant to 42 U.S.C. § 1983), the Eleventh Circuit has recognized that gender stereotyping can be viewed as sex discrimination.  *Glenn v.* Brumby, 663 F.3d 1312, 1318 (11th Cir. 2011). In this case, Plaintiff asserts that Vest harassed him based on gender stereotypes. After reviewing the evidence in the Rule 56 record, the court agrees that Vest's comments implicate stereotyping by gender. *Compare Brumby*, 663 F.3d at 1318 (prohibited gender stereotyping when a plaintiff "wear[s] jewelry that was considered too effeminate") *and* (Doc. # 51-1 at Ex. 3, ¶ 4) (Vest stated Plaintiff was wearing was a "girl's bracelet" for "females and not for guys to wear").  This opinion assumes that with respect to his harassment claim, Plaintiff is in a protected category.

Plaintiff to establish a hostile environment sexual harassment claim under Title VII, he must show: (1) that he belongs to a protected group; (2) he has been subject to unwelcome sexual harassment; (3) the harassment was based on his sex; (4) the harassment was severe or pervasive to the extent that it altered the conditions of the employment; and (5) that there is a basis for holding the employer responsible. *Mendoza v. Borden Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*), *cert. denied*, 529 U.S. 1068 (2000). The parties do not dispute that Plaintiff belongs to a protected group or that he was subjected to harassment based on his sex. The court likewise assumes Plaintiff has satisfied his burden on these elements of a sexually hostile work environment claim.[10] The court addresses the remaining two elements below, in turn.

### 1.    Vest's Harassment Was Not Sufficiently Severe or Pervasive to Alter the Terms Or Conditions of Plaintiff's Employment

Defendant argues that Plaintiff has not carried his burden of proving that Vest's harassment was severe or pervasive enough to alter the terms or conditions of his employment. The court agrees.

"Sexual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment."  *Mendoza*, 195 F.3d at 1245. In the absence of "explicit" discrimination (for example, that affecting "an employee's expressed terms of employment, such as salary or continued employment," *id.*), "an employee must make some showing in order to connect allegations of sexual harassment to a violation of Title VII." *Id.* "[A]n employer's harassing actions toward an employee do not constitute employment discrimination under Title

---

[10] *See* note 9, *supra*. Further, the nature of Vest's statements in the summary judgment record suggest that they are based on sexual stereotype. There is no indication that Plaintiff solicited and desired Vest's comments. *See Henson v. Dundee*, 668 F.2d 897, 903 (11th Cir. 1982) ("The harassment must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive."). Therefore, the court assumes without further analysis that, for purposes of Plaintiff's sexually hostile work environment claim, Plaintiff belongs to a protected group under Title VII (*i.e.*, sexual stereotype, or sex) and was subjected to unwelcome harassment based on his sex. But, as discussed in more detail below, even if Plaintiff has satisfied these elements, his hostile work environment claim fails because he has not satisfied the remainder of the elements.

VII unless the conduct is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 1245-46 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) (internal quotations, brackets, and additional citations omitted).

Establishing whether harassing conduct was sufficiently severe or pervasive so as to alter an employee's terms or conditions of employment involves both a subjective and an objective inquiry. *Mendoza*, 195 F.3d at 1246 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id.* "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23).

The examination of the objective component is "somewhat fact intensive." *Mendoza*, 195 F.3d at 1246. Nonetheless, the Supreme Court and the Eleventh Circuit have set forth four factors that a district court should consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Mendoza*, 195 F.3d at 1246 (citations omitted). The conduct must be examined in context and not as isolated acts, and the court must determine under the totality of the circumstances whether the harassing conduct is severe or pervasive enough to alter the terms or conditions of a claimant's employment and create a hostile or abusive working environment. *Id.*

Here, Plaintiff has stated that Vest's comments were unwanted and unsolicited. (Doc. #

51-1 at Ex. 1, ¶ 7). Although Plaintiff has not plainly stated that he found those comments to be hostile and abusive, the court assumes that he subjectively perceived them to be as such.

Similarly, the court need not assess the frequency of Vest's comments because, based on the evidence in the Rule 56 record, that would be a question for a jury question to decide. But here, for other reasons, the harassment claim need not be presented to a jury, because Plaintiff has not satisfied his Rule 56 burden regarding either the severity of the harassment or interference with the conditions of his employment. The court examines each element below, in turn.

### a. Plaintiff Has Not Presented Rule 56 Evidence Showing Conduct That Was Sufficiently Severe to Alter the Terms or Conditions of Employment

In assessing the severity of an employer's conduct, the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment."). Title VII "does not operate as a general ban on . . . rude or offensive behavior." *Leslie v. Cumulus Media, Inc.*, 814 F. Supp. 2d 1326, 1343 (S.D. Ala. 2011) (citation omitted); *see also Mendoza*, 195 F.3d at 1245 ("Title VII is not a federal 'civility code.'"). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (internal citation omitted).

Plaintiff has stated that Vest made comments regarding his sexual orientation, including "are you a cross-dresser," "do you dress in drag," and calling his personal bag a purse. (Doc. # 51-1 at Ex. 1, ¶ 7). Moore likewise witnessed Vest call Plaintiff a "Drag" and say that Plaintiff's "butt is too big for those pants."[11] (Doc. # 51-1 at Ex. 2, ¶ 4). And, Nelson heard Vest say to Plaintiff that his "bracelet is for females and not for guys to wear," that his lunch bag a "purse," and that he looked like a "drag queen" when dressing up for Halloween. (Doc. # 51-1 at Ex. 3, ¶¶ 3-5). Plaintiff asserts other such statements were made but has not specifically listed them. Viewing this evidence in the light most favorable to Plaintiff, the court concludes that Vest's comments were not objectively severe enough to alter Plaintiff's terms or conditions of his employment.

"Many decisions throughout the circuits have rejected sexual-harassment claims based on conduct that is as serious or more serious than the conduct at issue in this [case]." *Mendoza*, 195 F.3d at 1246-47 (collecting cases). Although Vest's comments may have been humiliating and degrading to Plaintiff based on his sex, he simply has not presented sufficient evidence to survive summary judgment on the issue of severity or pervasiveness. *Compare Leslie*, 814 F. Supp. 2d at 1343 (alleged harassment was not severe enough when plaintiff presented four "offhand" and "isolated" offensive comments, and one instance of co-worker sending sexually suggestive email photograph), *and Howard v. City of Robertsdale*, 168 Fed. Appx. 883, 885 889-90 (11th Cir. 2006) (holding that supervisor's offensive comments about employees' bodies and sex lives and sexual jokes made in front of other employees on a regular basis did not rise to the level of objectively severe or pervasive harassment), *with Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 812 (11th Cir. 2010) (evidence supported plaintiff's complaint that employer's

---

[11] The court acknowledges that Moore has stated she witnessed Vest making these statements on February 14, 2014—a date *after* Plaintiff was terminated. (Doc. # 51-1 at Ex. 2, ¶ 4)

offensive conduct occurred "every single day" and consisted of multiple derogatory terms aimed at women, vulgar sexual discussions, and the presence of pornographic images in the workplace, and could allow a jury to draw a reasonable inference of pervasive harassment).[12] The court determines that, based upon the evidence in the summary judgment record, a reasonable jury would not be able to infer from the comments by Vest that his conduct was sufficiently severe to change the terms or conditions of Plaintiff's workplace.

### b. Plaintiff Has Presented No Evidence That Vest's Comments Interfered with His Job Performance

Even if Plaintiff had presented enough evidence demonstrating that Vest's comments were severe or pervasive (and, to be sure, he has not), he has not presented evidence that the "cumulative effect" of Vest's conduct "unreasonably interfered" with Plaintiff's job performance. *Mendoza*, 195 F.3d at 1248. Again, Vest's comments may have bothered Plaintiff or been humiliating, but more is required in order for Plaintiff to make a showing that those comments were so severe or pervasive that Plaintiff's terms or conditions of employment were altered. And, in this regard, nothing in the record indicates that Vest's conduct impaired Plaintiff's job performance. Rather, Plaintiff has stated that he "never had any complaints lodged against [him] by any of the residents at Danberry," and claims he "was never written up for any performance issues." (Doc. # 51-1 at Ex. 1, ¶ 4). Indeed, the first hint of any problem with Plaintiff's job performance was when he was told he had non-compliant shoes, (and believed he was not to attend work until he obtained different ones), but there is no evidence that his being told to get new shoes was a form of harassment or conduct concerned with any sexual stereotype.

---

[12] Although Moore reported in her affidavit that Vest "picked on Plaintiff every day" (Doc. #51-1 at Ex. 2), "picking on" someone simply does not rise to the level of impermissible harassment under Title VII.  The court acknowledges that some of these instances of "picking on" likely included statements similar to those implicating gender stereotypes.  Nevertheless, there is insufficient evidence in the Rule 56 record to conclude that the alleged daily "picking on" involved harassing statements focused on Plaintiff's sex and gender stereotypes made on a sufficiently severe or pervasive basis.

Because the record is devoid of any evidence that Vest's conduct "unreasonably interfered" with Plaintiff's job performance, Plaintiff has not satisfied his burden that Vest's conduct was severe or pervasive enough to alter the terms of employment, and Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

> **2.     Because Plaintiff Did Not Utilize the Procedures in Defendant's Harassment Policy, There Is No Basis for Holding Defendant Responsible for the Vest's Harassment**

Even if Plaintiff had been subjected to severe and pervasive harassment (and to be clear, he was not), Defendant argues that Plaintiff's hostile work environment claim against Defendant nevertheless fails because he did not utilize Defendant's internal complaint procedures to report it. The court agrees.

As the Eleventh Circuit has observed, there is an affirmative defense to an employer's liability for a supervisor's sexual harassment, "which the Supreme Court [recognized] in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1292 (11th Cir. 2007). The *Faragher-Ellerth* "defense has two halves, one of which focuses on the employer's responsibility to prevent or correct workplace harassment, and the other of which focuses on the employee's responsibility to protect [him]self and others from harassment by using the procedures the employer has in place to promptly report it." *Id.* For an employer to prevail under the *Faragher-Ellerth* defense, the "employer must show not only that it fulfilled its responsibility, but also that the employee failed to fulfill [his]." *Id.* Stated otherwise, an employer avoids liability if: (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior;" and (2) the employee "unreasonably failed to take advantage of any preventative or corrective opportunities [the employer] provided." *Faragher*, 524 U.S. at 807;

*Ellerth*, 5224 U.S. at 765. The employer bears the burden of establishing both of these elements. *Baldwin*, 480 F.3d at 1303.

Here, the evidence on this issue is undisputed and Defendant has met its burden. The parties do not dispute, and the court agrees, that Defendant has satisfied the first prong of the affirmative defense. The Rule 56 evidence shows that Defendant's Harassment Policy is "comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress." *Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997). There is no dispute Plaintiff twice signed an acknowledgment that he read and received the Harassment Policy. (Docs. # 46-10, 46-11). The Harassment Policy is by its plain language comprehensive. (*See* Doc. # 46-10). Further, the Rule 56 evidence shows that the policy has been enforced. Indeed, Plaintiff had been subject to redress and internal counseling under it on a previous occasion. Thus, Defendant has satisfied the first prong of the *Faragher-Ellerth* defense.

Defendant also argues that Plaintiff failed take advantage of the procedures set forth in the Harassment Policy. However, Plaintiff contends in this instance that a material dispute of fact exists as to whether Plaintiff reported the harassment to two management-level employees -- Crosby and Lanzi -- who took no action. After careful review, the court determines that the Rule 56 record supports Defendant's position and that it has carried its burden on the second prong of the *Faragher-Ellerth* defense.

Although Defendant has the burden of establishing that Plaintiff unreasonably failed to take advantage of its Harassment Policy,[13] Plaintiff as "a victim of coworker harassment must

---

[13] The Harassment Policy provides that:

You are required to notify your supervisor or the Human Resources Director, President or a member of Managing Committee immediately of any harassment, even if you are not sure the offending behavior is considered harassment under this policy. Any possible incidents of harassment must be immediately reported to a manager or other management representative by anyone who may witness them.

show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge of the employer." *Miller v. Kentworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002). The court has determined above that Plaintiff has failed to present sufficient evidence establishing severe and pervasive conduct, and thus cannot show Defendant had constructive knowledge of harassment.[14] Accordingly, Plaintiff must prove that Defendant had actual notice of sexual harassment. "Actual notice [or, stated differently, actual knowledge] is established by proof that management knew of the harassment." *Id.*

The court determines that Plaintiff has not established actual knowledge of the alleged harassment. The court assumes Plaintiff reported Vest's allegedly harassing statements to "Head Nurse" Cynthia Crosby and "Housekeeping/Maintenance Supervisor" Chuck Lanzi. (Doc. # 51-1 at Ex. 1, ¶¶ 9, 10). He did not complain to Wallingford, Hebert, Gardner, anyone on the Management Committee, or anyone else at Danberry. Plaintiff has not provided any statements or testimony from Crosby or Lanzi (and, at least arguably, could not have validly done so). (*See* Doc. # 57 (arguing Plaintiff did not include Crosby or Lanzi in his Rule 26 disclosures)). Nor does Plaintiff set forth what he actually said to them, or when. Instead, Plaintiff states he "expressed" to Crosby and Lanzi that "Vest was harassing [him] because of his gender identity and sexual preferences." (Doc. # 51-1 at Ex. 1, ¶¶ 9, 10). Those averments are not only conclusory. And, just as importantly, Plaintiff's "complaints" were not made to persons authorized by the policy to receive a complaint. Thus, Plaintiff cannot rely on conclusory

---

(Doc. # 46-10 at p. 3). To be sure, that language, on its face, is unclear. It is not clear that the phrase "manager or other management representative" in the second sentence is limited to members of the Managing Committee, or encompasses other positions employed by Defendant.

[14] To be clear, although Vest was one of Plaintiff's supervisors, the court has determined that the evidence in the summary judgment record is insufficient to establish that Vest objectively subjected Plaintiff to sexual harassment.

allegations and assertions alone to demonstrate actual knowledge (or, for that matter, constructive knowledge) of complaints of alleged harassment to Danberry's management. *See Gargiulo*, 131 F.3d at 999. Plaintiff is instead required to present "concrete evidence in the form of specific facts." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).  This Plaintiff has failed to do.  It is undisputed on this record that he unreasonably failed to take advantage of the Harassment Policy.

Defendant's Harassment Policy, in plain language, instructs an employee who has been harassed to report that fate to "your supervisor or the Human Resources Director, President or a member of the Managing Committee immediately…, even if you are not sure the offending behavior is considered harassment under this policy." (Doc. #46-10 at p. 3).  On the other hand, those who witness harassment are to immediately report that to a manager or other management representative.  Thus, the language of the policy sets out two tracks for reporting harassment: one for those who are harassed, and one for those who witness harassment.  Defendant's policy obviously contemplates supervisor harassment and recognizes that when someone is harassed by a supervisor, it may be ill advised to report that to the supervisor.  Here, Plaintiff perceived harassment, and therefore was obliged to report that fact to the "Human Resources Director, President, or a member of Managing Committee immediately.…" (Doc. #46-0 at p. 3).  Plaintiff's reported complaints to Crosby and Lanzi[15] were not reasonable under the

---

[15] Crosby and Lanzi do not work in the Dining Department.  There is no indication in the Rule 56 evidence that Lanzi ever worked in the Healthcare Department. Again, Plaintiff does not state when he complained to Crosby and Lanzi. *Cf. Mangrum v. Republic Indus., Inc.*, 260 F. Supp. 2d 1229, 1254 (N.D. Ga. 2003) (plaintiff's failure to report alleged harassment to employer for almost a month after the incident and the fact that her "report" came in the form of demand letter from her attorney and not from her directly as required by the policy were not reasonable under circumstances).  And, although title alone is not indicative of whether an employee acts in a managerial capacity, Plaintiff has submitted no facts to demonstrate that Crosby or Lanzi held any type of supervisory or managerial position during his time of employment.  In addition, Plaintiff has not set forth what he said to them. Without knowing what was said (and putting aside the fact that Plaintiff's averments about the complaints are conclusory), the court cannot determine that a jury may draw a reasonable inference that Plaintiff reasonably utilized Defendant's Harassment Policy. *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364-66 (11th Cir. 1999)

circumstances and did not trigger Defendant's policy. Plaintiff did not work as a nurse or in housekeeping. He was a Server and Resident Assistant and Sitter. The supervisors and directors of Dining and Healthcare Departments were Vest, Wallingford, and Robinson. And the summary judgment evidence shows that while Plaintiff frequently spoke with Hebert and Wallingford, he never complained to them about any alleged harassment by Vest.

For all these reasons, the court finds that Defendant has established it is entitled to judgment as a matter of law on its *Faragher-Ellerth* defense, and Plaintiff, furthermore, has fallen short of pointing to any basis to hold Defendant liable for the alleged harassment.

### B.    Plaintiff's Termination Claim

Plaintiff asserts he was terminated because of his sex, but the exact contours of his sex discrimination claim are somewhat unclear.  Thus, in addressing whether Plaintiff has presented a *prima facie* case of discrimination, the court must distinguish between two distinct theories: (1) discrimination based upon sexual orientation; and (2) discrimination based upon gender stereotyping.  After careful review, the court concludes that Plaintiff has established a prima facie case based on gender stereotyping, but any assertion of discrimination based upon sexual orientation does not state a claim under Title VII. *See Fredette v. BVP Mgmt. Associates*, 112 F.3d 1503, 1510 (11th Cir. 1997) (concluding that discrimination based on sexual orientation is not actionable under Title VII, although gender discrimination may present an actionable claim under Title VII); *Fitzpatrick v. Winn-Dixie Montgomery, Inc.*, 153 F. Supp. 2d 1303, 1306 (M.D. Ala. 2001) (finding "sexual orientation is not a protected class under Title VII"); *Glenn v. Brumby*, 663 F.3d 1312, 1318 (11th Cir. 2011) (string citing cases for the proposition that under

---

(plaintiff did not make "reasonable sufficient use of the channels created by [the] policy" where attempts to report harassment involved unclear statements or notice to the managers and supervisors required under her employer's harassment policy because employer was not put on sufficient notice).

Title VII "[a]ll persons… are protected from discrimination on the basis of gender stereotype"). As explained below, Plaintiff has successfully set forth a prima facie case of gender stereotyping; therefore, the court must also analyze Defendant's articulated reason for terminating Plaintiff and decide if there is sufficient evidence that reason is a pretext for discrimination.

### 1.   Plaintiff Has Established a *Prima Facie* Case of Discrimination Based Upon Gender Stereotyping But Not Sexual Orientation

In the usual case, in order to make a *prima facie* case for wrongful termination through circumstantial evidence, an employee must making a showing what is known as the *McDonnell Douglas* framework that he: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the job; and (4) that his employer treated similarly situated employees outside his classification more favorably. *Wilson*, 376 F.3d at 1092 (citations omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Here, it is undisputed that Plaintiff's employment at Danberry was terminated and that he suffered an adverse employment action. Likewise, the parties do not dispute that Plaintiff was qualified for the job.

### a.   Plaintiff Has Not Shown Direct Evidence

An employee may establish a prima facie claim of impermissible discriminatory termination through either direct evidence or circumstantial evidence. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004) (citation omitted). Plaintiff argues that there is direct evidence that discrimination on the basis of gender stereotypes was a motivating factor behind his termination. Defendant argues that there is no direct evidence of a discriminatory motive as related to Plaintiff's termination. The court agrees.

Direct evidence of discrimination is "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discriminat[ory] or retaliate[ory] [act] complained of by the

employee.'" *Wilson*, 376 F.3d at 1086 (citations omitted). It is "evidence that, if believed, proves [the] existence of [a] fact without inference or presumption." *Burrell v. Bd. of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (citations omitted). "[D]irect evidence can mean nothing other than evidence from which a trier of fact could conclude, more probably than not, that the defendant discriminated against the plaintiff in regard to the contested employment decision on the basis of a protected personal characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1306 (11th Cir. 1999). "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Wilson*, 376 F.3d at 1086 (citations and internal quotations omitted). In other words, there must be "a statement that (1) is by the employer (*i.e.*, by the decisionmaker), (2) reflects a discriminatory attitude, and (3) ties the discriminatory attitude to the relevant employment decision." *Wright*, 187 F.3d at 1294. "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Wilson*, 376 F.3d at 1086 (citing *Burrell*, 125 F.3d at 1393).

Here, Plaintiff contends there is "significant 'direct evidence' that a motivating factor in [his] termination was information provided by a decisionmaker who was biased against him because of his non-conformity to gender stereotypes of what a man or woman should act like." (Doc. # 51 at p. 20). In particular, Plaintiff argues that Defendant is liable under the so-called "cat's paw" theory of liability because it relied, in part, on Vest's input in deciding to terminate Plaintiff,[16] (*id.* at p. 20, n. 3), and Plaintiff asserts, Vest made discriminatory comments to him.

---

[16] "The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by [Judge] Posner in 1990." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n. 1 (2011) (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990)).

In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant, only marginally, if at all, to employment

(*Id.*). As already noted, in order for Vest's "comments" to be direct evidence, Plaintiff would have to show that (1) he is a decision maker, (2) his comments directly evidence a discriminatory intent, and (3) the statements that discriminatory intent to the decision challenged, i.e., the decision to terminate Plaintiff's employment. In essence, here, Plaintiff attempts to graft two separate concepts – direct evidence and the cat's paw theory – into one evidentiary formula, and argues that Vest's comments are direct evidence of a discriminatory discharge decision. The court disagrees and finds Plaintiff's theory is fatally flawed for the following reasons.

Under any view of the applicable law, Vest's comments cannot be characterized as direct evidence. That is, while his comments may suggest he gender stereotyped Plaintiff, they are not in any way related to the decision to discharge Plaintiff. An inference is required to be drawn before it can be said these comments suggest a discriminatory motive to terminate Plaintiff (e.g., because he gender stereotyped Plaintiff, Vest would push for his termination). In other words, Vest's remarks, even if fully credited, suggest – but do not prove – that he may have had a discriminatory motive. "By definition, then, [this] is circumstantial evidence." *Burrell*, 125 F.3d at 1393-94 (citation omitted).

In any event, for Plaintiff's direct evidence/cat paw theory to pass muster, he must show direct evidence that Vest's alleged discriminatory actions against his protected status was a motivating factor in Gardner's decision to fire him.[17] Vest's statements to Plaintiff alone provide no direct evidence that Defendant (that is, Gardner) "relied on, took into account, considered, or conditioned its decision on that consideration." *Coffman*, 411 F.3d at 1238. All Plaintiff can rely

---

law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

*Id.*

[17] "A motivating factor does not mean that it had to be the sole cause of the employment action. Instead, it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005) (citations and internal quotations omitted).

on is circumstantial evidence of discriminatory motive. *See id.* Thus, Plaintiff has failed to present direct evidence that he was terminated for discriminatory reasons.

### b.   Analysis of Plaintiff's Prima Facie Case

The court turns next to whether Plaintiff has established a *prima face* case through circumstantial evidence. After careful review, the court determines he has done so in connection with his gender stereotyping claim, but not his sexual orientation assertion.

As Defendant has noted, Plaintiff has not presented *any* evidence of Defendant's treatment of similarly situated employees (*i.e.*, comparators). But Plaintiff's claim does not rise and fall only on such a showing (or lack thereof).  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."). This is because "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328 (citations omitted); *see also Holifield*, 115 F.3d at 1562 (declaring that, where plaintiff cannot establish a *prima facie* case, summary judgment is only "appropriate where no other evidence of discrimination is present."). The Eleventh Circuit has instructed that "[a] triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith*, 644 F.3d at 1328 (quoting

*Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)). The determination of whether a plaintiff has presented sufficient circumstantial evidence of intentional discrimination is a flexible one. *See id.* ("[N]o matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.").

In this case, Plaintiff points to the fact that Vest was consulted about the decision to terminate him, and that there is Rule 56 evidence that Vest made allegedly discriminatory statements.  The question remains whether Vest's views (i.e., those views that can be inferred from his gender stereotypical comments made to Plaintiff) played any part in the decision to discharge Plaintiff.  In order for his cat paw theory to pass muster, Plaintiff must show that Vest's alleged discriminatory attitude was a motivating factor in Gardner's decision to fire him. In other words, under the cat's paw theory, an employee must show that "the decisionmaker acted in accordance with the harasser's decision." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). As explained more fully below, it is for a jury to determine if Vest influenced Gardner's decision to discharge Plaintiff for discriminatory reasons. Gardner undisputedly was the decisionmaker who terminated Plaintiff. (Doc. # 46-12 at ¶ 7, 8).  But in making her decision, she considered input from Vest, among others.[18] (*Id.* at ¶ 8).

In addition, Plaintiff had previously asked Vest why he was taken off the schedule to work on February 8, 2014 (Doc #51-1 at Ex. 1 ¶ 21). Vest told Plaintiff he was not sure why that had occurred. (*Id.* At ¶ 20). Yet, Plaintiff has presented evidence that Vest was the one responsible for scheduling the shifts. (*Id.*) Plaintiff also claims he had unsuccessfully attempted

---

[18] Plaintiff points to undisputed evidence that vest had the power to issue, and did issue, written and verbal reprimands. (Doc. # 46-9 at pp. 7, 8). So did other supervisors, who also reprimanded Plaintiff. (Doc. # 46-9 at pp. 3, 4). These reprimands were due to Plaintiff's attendance issues and did not relate to his appearance. Vest's comments, however, concern Plaintiff's appearance.

to communicate with Vest about missing the February 6 shift. (*Id.* at ¶16). He followed up with an email to Vest at 8:54 a.m. that day, a little more than ninety minutes before he was scheduled to start his shift. (*Id.* at ¶ 16).  The evidence shows that Vest, and others, gave input to Gardner (who also reviewed Plaintiff's disciplinary history) when she decided to terminate Plaintiff for missing two days of work. (Doc. # 46-12 at ¶¶ 7-8).  Under these facts, a reasonable jury could conclude that Vest, for discriminatory reasons, orchestrated certain events leading to (and gave input about) Plaintiff's termination.  At a minimum, there is sufficient circumstantial evidence to raise an inference that Vest's gender stereotyping of Plaintiff was a factor in the decision to terminate Plaintiff.

### 2.     Plaintiff Has Raised a Triable Issue as to Whether Defendant's Articulated Reason for Terminating Him is Pretextual

In response to Plaintiff's prima facie case, Defendant has articulated legitimate, nondiscriminatory reasons (absence from work and violations of the Attendance Policy) for discharging Plaintiff. "To survive summary judgment, Plaintiff must come forward with evidence that Defendant's articulated legitimate, nondiscriminatory reason is merely a pretext for unlawful discrimination." *Nowlin v. Jones Intercable, Inc.*, 102 F. Supp. 2d 1364, 1371 (S.D. Ga. 2000) (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

There is no dispute that Plaintiff missed his scheduled shifts on February 6 and 8, 2014. The Handbook states that "An absence of two (2) days without notice by the employee is considered Job Abandonment. You will be subject to disciplinary action up to and including termination."  (Doc. # 46-1 at ¶ 6; Doc. # 46-3 at p. 12). Likewise, the Attendance Policy provides that employees who fail to report to work or call in for two consecutive workdays or on two separate occasions will be considered to have voluntarily resigned or abandoned their jobs. (Doc. # 46-1 at ¶ 7; Doc. # 46-4).

Nevertheless, Plaintiff disputes that he was a no call/no show, and asserts he did not violate the Attendance Policy or the Handbook. He claims that Wallingford told Servers on February 5, 2014, that if they did not have the appropriate shoes, they should not bother coming to work the next day. (Doc. # 51-1 at Ex. 1, ¶ 14). Vest had previously told Plaintiff in late January 2014 that he did not have the appropriate shoes, so Plaintiff determined he was not to attend work on February 6. (*Id.* at ¶¶ 12, 15). Plaintiff claims he unsuccessfully tried to call Vest, and, when he could not reach him, sent this email to Vest ninety-six minutes before the beginning of his shift. (*Id.* at ¶¶ 15, 16; Doc. # 46-8).

> I remember at the meeting yesterday that Dave said we need our non slip work shoes by today. Mine are on order. I understand the proper safety shoe policy and know that I need them. I do not have the proper work shoe at this time. They should be here in 3 days.

(*Id.*). Plaintiff also claims that when he worked in the Healthcare Department on February 7, 2014, he noticed his name had been marked off the Dining Department work schedule for his shift on February 8, 2014.[19] (Doc. # 51-1 at Ex. 1, ¶ 19). He claims he spoke with Vest, but Vest told Plaintiff he did not know why Plaintiff's name was marked off the schedule. (*Id.* at ¶ 20). Plaintiff understood that the marking out of his name indicated he was not required to report for work on February 8, 2014, and for that reason he did not report to work that day. (*Id.*; Doc. # 46-1 at ¶ 17).

It is undisputed that Plaintiff did not report to work on February 6, and Defendant contends he did not give express notice that he would not be at work.  But, in light of other evidence about Vest and his attitude toward Plaintiff, it is for a trier of fact to decide whether Vest was aware Plaintiff had given notice that he would not report on February 6, and (in light of

---

[19] According to Plaintiff in his opposition brief, because he had been marked of the schedule on February 7, 2014, it indicates that Defendant had already decided to terminate him. (Doc. # 51 at p. 22).

whatever input Vest provided about the discharge decision) whether Defendant had a good faith basis to conclude that Plaintiff violated its attendance policy.

"[T]he ultimate question in a disparate treatment case is not whether the plaintiff has established a prima facie case or demonstrated pretext, but whether the defendant intentionally discriminated against the plaintiff." *Nix v. WLCY Radio/Rahall Commc's*, 738 F.2d 1181, 1184 (11th Cir. 1984). It follows, therefore, that an employee "will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). On the issue of pretext, in his brief in opposition, Plaintiff argues as follows:

> Defendant's non-discriminatory reason for terminating Ashford is also not worthy of belief. First, Ashford was not a no call/no show as the Defendant alleges. The undisputed testimony is that it was the Defendant who informed Ashford and the other Servers that they should not report to work if they did not have the proper shoes. The day Ashford was to report to work on the Dining side of Danberry he emailed Mr. Vest that he had ordered the proper shoes and his understanding that he was not to report to the Dining side if he did not have them. The Defendant never responded to Ashford's email or acknowledged its content.

> Ashford saw both of his Dining department supervisors on February 7th which was the day he was working on the Healthcare side of Danberry and neither one of them made mention to him of any problem with him not showing up for work on February 6, 2014. Furthermore, on February 7, 2014, Ashford had already been marked off the schedule for February 8, 2014, which indicates that the Defendant had already made its mind up to terminate him before the following week as it is now alleging. *See Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926 (11th Cir. 1995), and *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 525 (11th Cir. 1994). In sum, this evidence raises a jury question as to whether Ashford was terminated at least in part due to his gender non-conformity.

(Doc. #51 at 21-22). The court agrees. The issues presented with respect to Plaintiff's termination must be decided by a jury.

## VI.     Conclusion

For all these reasons, Defendant's Motion for Summary Judgment is due to be granted in part and denied in part. The court will enter a separate order.

**DONE** and **ORDERED** this September 6, 2016.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE